UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*In Re* SOL IRIS KIM

YOO KYUNG CHOI,

               Petitioner,

     -v-

CHEE KWAN KIM,

               Respondent.

Case No. 05-CV-7141

OPINION AND ORDER

---

Appearances:

Robert D. Arenstein, Esq.
Christopher S. Weddle, Esq.
New York, N.Y.
*Counsel for Petitioner*

Bonnie Rabin, Esq.
Harriet Newman Cohen, Esq.
Timothy James, Esq.
Cohen Hennessey & Bienstock P.C.
New York, N.Y.
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

     Sol Iris Kim is a four-year-old girl who is the subject of a brewing custody battle between

her estranged parents. Before this Court is the Petition of Sol Iris's mother, Yoo Kyung Choi

("Petitioner"), which she brought pursuant to the Hague Convention on the Civil Aspects of

International Child Abduction, art. 2, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89,

reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986) [hereinafter Hague Convention], and the

International Child Abduction Remedies Act, 42 U.S.C. § 11601-11611 (2005) ("ICARA"). The

Petition seeks an order requiring that Sol Iris return to Toronto, Ontario. On September 21, 2005, the Court dismissed the Petition, promising that a written opinion would be forthcoming. This is that written opinion.

## I. Background

On August 12, 2005, Petitioner filed in this Court a Petition for the Return of Child to Petitioner pursuant to the Hague Convention and ICARA ("Petition"). Accompanying the Petition, was an Emergency Petition for a Warrant in lieu of a Writ of Habeas Corpus ("Emergency Petition"). The Emergency Petition sought an order from this Court for the immediate return of Sol Iris to Petitioner without notice to Chee Kwan Kim ("Respondent"). In support of the Emergency Petition, Petitioner submitted a sworn affidavit complete with several attachments.[1]

In addition to the exhibits to the Emergency Petition, the Court heard sworn testimony from the Petitioner and considered additional statements from counsel for Petitioner. During the *ex parte* proceeding on August 12, 2005, Petitioner, through her sworn statements, and her counsel, through his comments, represented that: (i) Petitioner is a lawful permanent resident of Canada and intends to become a Canadian citizen and live there permanently (Tr. 20, Aug. 12, 2005)[2]; (ii) Sol Iris was born in Toronto, Ontario, where Petitioner resides with her parents, and

---

[1]Because the judge to whom this matter was randomly assigned was not available, this Court heard the Emergency Petition in its "Part I" capacity. Also, because the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and ICARA require courts considering petitions such as the one at bar to do so expeditiously, this Court has continued to preside over the case. *See* Hague Convention, *supra*, art. 2.

[2]The Court held two hearings – an *ex parte* proceeding on August 12, 2005 and an evidentiary hearing on August 17, 19, 23, 24, 25, 31 and September 1, 2005. Where there is an
(continued...)

lived there from August 2004 until May 2005 (Tr. 21-23, Aug. 12, 2005); (iii) Respondent

agreed that while he was in law school Petitioner was to be the primary caregiver (Tr. 23, Aug.

12, 2005); (iv) Respondent provided written consent to permit Petitioner to travel with Sol Iris

from Toronto to Cambodia and back to Toronto beginning in May 2005 (Tr. 3, Aug. 12, 2005);

(v) on her return trip from Cambodia to Toronto, Petitioner brought Sol Iris to New York on

August 2, 2005, for a four-day stay to permit Sol Iris to visit with Respondent (Tr. 25, Aug. 12,

2005); (vi) upon arrival in New York on August 2, 2005, Petitioner was told that she could not

stay in the apartment where Respondent resided with his aunt (Tr. 26, Aug. 12, 2005); (vii)

Petitioner had not seen or talked to Sol Iris since, and was barred by Respondent from seeing or

speaking with Sol Iris after, August 6, 2005 (Tr. 8, 25, Aug. 12, 2005); (viii) on August 5, 2005,

Petitioner sent Respondent an email insisting that she be allowed to take Sol Iris "home" to

Toronto (Tr. 27-28, Aug. 12, 2005); (ix) after sending the August 5 email, Petitioner spoke to

Respondent who told Petitioner that she would never see Sol Iris again and that Sol Iris's home

was Korea and not Canada (Tr. 14, 28, Aug. 12, 2005); (x) after Petitioner's arrival in New York

on August 2, Respondent on several occasions asked for Sol Iris's Korean passport (Tr. 14, Aug.

12, 2005); (xi) Respondent filed a custody action in New York State Family Court with an

unknown return date (Tr. 4, Aug. 12, 2005) and; (xii) Respondent has a history of physically

abusing Petitioner, and because of Respondent's "depression problem," Petitioner believed that

it was "very reasonable to suspect" that Respondent might engage in physical violence toward

Sol Iris.  (Tr. 29, Aug. 12, 2005)

---

[2](...continued)
overlap in the page numbers of the transcripts, the relevant date is provided.

Based on these representations, the Court entered an Order and issued a warrant directing the United States Marshals Service to remove Sol Iris from Respondent's custody and turn her over to Petitioner.[3] Petitioner was directed to surrender her passport, as well as Sol Iris's passport, to stay within the confines of the Southern and Eastern Districts of New York, and to provide the Marshals Service with her local address.[4] (Tr. 48, Aug. 12, 2005; Order, Aug. 12, 2005) The Court scheduled a hearing on the matter for the next business day, which was Monday, August 15, 2005.

At the August 15, 2005 hearing, both Petitioner and Respondent appeared through counsel. Cognizant that Respondent had not yet had an opportunity to present his case, the Court gave Respondent an opportunity to summarize his position and inquired of Respondent as to when he would be prepared to conduct an evidentiary hearing. Respondent noted that he had filed an Order to Show Cause in New York State Family Court seeking temporary emergency jurisdiction to prevent harm to Sol Iris.[5] (Tr. 6, Aug. 15, 2005) Ultimately, Respondent indicated that he would consent to a stay of the state court action,[6] that he would be prepared to proceed with an evidentiary hearing by August 17, 2005, and that he and Petitioner

_____

[3]The Court denied Petitioner's request for a stay of any proceedings in state court. (Tr. 50, Aug. 12, 2005)

[4]The Marshals Service was also directed to place Petitioner's name in a customs "lookout" that would further restrict her ability to leave the country. (Order, Aug. 12, 2005)

[5]It was during the discussion surrounding Respondent's application that the Court learned for the first time that Petitioner, before filing the Petition in this Court, had sought to bring an action in New York State Family Court. (Tr. 28, Aug. 12, 2005) This proved to be an omen as the Court would later learn of several other material omissions and misrepresentations made by Petitioner and her counsel during the August 12, 2005 *ex parte* proceeding. *See infra* Part III.C.

[6]This Court indicated that it would not enter an order staying any divorce or custody proceedings in Ontario, Canada.

would agree to a custody arrangement of Sol Iris until that time.[7] (Tr. 52, 91, 93, 100, 106)

The Court then conducted an evidentiary hearing on August 17, 19, 23, 24, 25, 31 and September 1, 2005. During this hearing, Petitioner and Noah Novogodsky, a professor at the University of Toronto Law School, testified on behalf of Petitioner. Respondent, Gwin Joh Chin (Respondent's aunt), and Chee Wan Kim (Respondent's brother), testified on behalf of Respondent. Respondent also called, as a hostile witness, Timothy Pfeifer, a New York attorney with whom Petitioner appears to have had an extramarital affair during the preceding months.

## II. Findings of Fact

### A. Credibility

Before turning to the Court's findings of fact, it is important to note that some of these findings involve facts about which there is agreement between the parties. Other facts, however, are the subject of sharp disagreement, including, of course, those facts most crucial to the resolution of the dispute. Thus, to resolve the dispute, the Court is required to make certain findings regarding the credibility of the witnesses.

Broadly speaking, the Court finds that Respondent and those who testified on his behalf were credible and that Petitioner was not. First, Petitioner's testimony was proven to be demonstrably false on several occasions. For example, during the *ex parte* hearing on August 12, 2005, Petitioner testified that it was made clear to her that she could not stay at Ms. Chin's apartment upon her arrival in New York on August 2, 2005, and that she was not allowed to

---

[7]As was true of Petitioner, Respondent was required to surrender his passport to the United States Marshals Service and to provide the Marshals Service with the address where Sol Iris would live while in his custody. Respondent was limited to travel within the Southern and Eastern Districts of New York. The Marshals Service also placed Respondent's name in a customs "lookout" to prevent his surreptitious departure from the country.

speak or see Sol Iris after August 6, 2005. (Tr. 4, 8, 25, Aug. 12, 2005) Yet, the credible evidence presented at the hearing was directly to the contrary. Ms. Chin specifically invited Petitioner to stay with her upon her arrival on August 2, 2005, but Petitioner declined claiming that she was going to stay with a "friend." (Tr. 575) Later that day, Petitioner confided to Ms. Chin that her "friend" was a "man," and that Respondent did not know that Petitioner's friend was a man. (Tr. 575) That man, it turned out, was Mr. Pfeifer. (Tr. 872). Under the circumstances, it is no stretch to imagine that Petitioner had every interest in staying with Mr. Pfeifer during her visit to New York, and therefore, that the decision not to stay at Ms. Chin's was entirely Petitioner's.

Moreover, the evidence conclusively proved that Respondent did not block Petitioner from speaking with or seeing Sol Iris. Indeed, the evidence demonstrated that Sol Iris refused to speak with Petitioner on the phone, in part because she was distracted by the toys she happened to be playing with when Petitioner called Respondent. (Tr. 720) Moreover, after being pressed on cross-examination, Petitioner finally admitted that she never even asked to visit Sol Iris at Ms. Chin's apartment. (Tr. 366-68)

Second, based on Petitioner's demeanor during her testimony, and particularly on cross-examination, it was clear to the Court that Petitioner was not truthful. On several occasions, Petitioner fumbled her answers to simple questions and feigned memory loss regarding events that had happened only days before her testimony. For example, Petitioner initially claimed memory loss when asked about her comment on August 2, 2005 that Sol Iris would be a New Yorker – which was suspect given that she had only made the comment two weeks earlier – but she then changed her testimony and admitted making the statement. (Tr. 238-39) On another

6

occasion, Petitioner claimed language difficulty as a reason for struggling with a cross-examination question (Tr. 129, 229), but Petitioner, a third-year law student who has lived in North America since 2000, did not appear to the Court to have much difficulty with the English language.

Third, Petitioner's credibility was undercut by the numerous instances where she contradicted her own testimony. For example, Petitioner admitted that she did not tell the truth when she testified at the *ex parte* hearing that the first time Respondent indicated he wanted a divorce was on August 2, 2005, the day that Petitioner arrived in New York from Cambodia. (Tr. 231-33) Petitioner also admitted on cross-examination that the portion of her sworn statement submitted in support of her *ex parte* request for a warrant stating that she had not filed any other action was untrue as she had filed a custody action in New York State Family Court the day before she brought this Petition.[8] (Tr. 83-84)

---

[8]This Court also found the testimony of Mr. Pfeifer not to be worthy of belief. Indeed, the Court was gravely disappointed with Mr. Pfeifer's conduct throughout these proceedings. For example, Mr. Pfeifer ignored email and voicemail communications from counsel for Respondent, who were attempting to ascertain the most efficient and discrete means of serving him with a subpoena to testify at the hearing. (Tr. 863-66) In fact, it became clear that Mr. Pfeifer ignored these communications up and through the day he believed the Court would conclude taking testimony in this case, in the hope of avoiding the witness stand. (Tr. 865-66) All the while, Mr. Pfeifer was in daily telephone contact with counsel for Petitioner – contact which was often initiated by Mr. Pfeifer himself. (Tr. 868)

As for his conduct during the trial, Mr. Pfeifer, like Petitioner, stumbled through simple questions regarding conduct that had happened no more than a month before the hearing. For example, Mr. Pfeifer claimed that he did not even remember the day that counsel for Respondent first left him a message, although she had done so less than two weeks before his testimony. (Tr. 863-66)

More importantly, Mr. Pfeifer changed his story regarding an August 7 email from Petitioner to Respondent. Initially, Mr. Pfeifer indicated that he only "looked at" the email before it was sent. (Tr. 907) Later, he allowed for the possibility that he "gave comments" about the email to Petitioner. (Tr. 909-10) Then, upon further questioning, Mr. Pfeifer admitted

(continued...)

In contrast to Petitioner, the Court found the testimony of Respondent, his aunt, and his brother to be credible. The testimony of each witness was corroborated by the documentary evidence in the case, limited as it was, as well as the testimony of the other witnesses. Each witness carried him or herself in the same manner on direct as on cross-examination, and the collective testimony of the three witnesses was far more logical than that of Petitioner. Thus, where there was a clash between the testimony of Petitioner and Respondent and those who testified on his behalf, the Court invariably found Respondent's version to be credible.[9] With this backdrop, the Court now turns to its findings of fact.

B.    The Chronology of Events

**Petitioner's and Respondent's Relationship Begins and Sol Iris is Born**

There is no disagreement about the beginnings of the relationship between Petitioner and Respondent, or the chronology of Sol Iris's whereabouts since her birth. Petitioner and Respondent, both Korean citizens, were married under Korean law in 2000. (Petr.'s Aff. ¶ 4, Aug. 8, 2005; Pet. Ex. C) Before Petitioner was pregnant with Sol Iris, she was accepted into Stonybrook Law School in New York. (Tr. 476) In January 2001, Respondent and Petitioner (then pregnant) left Korea and moved so Petitioner could attend law school. (Tr. 476) For the first month, they lived with Ms. Chin in New York City, and then moved to Stonybrook. (Tr.

---

[8](...continued)
that he "may have sat down and edited" the email, but that he was not sure if he remembered exactly what he had done. (Tr. 910-11)

[9]The Court recognizes that it credited Petitioner's testimony after the *ex parte* hearing and indeed relied on that testimony to order that Sol Iris be taken from Respondent on August 12, 2005. Obviously, the Court did not have the benefit either of observing Petitioner under cross-examination, or hearing Respondent's version of events, both of which exposed Petitioner's misrepresentations and omissions.

476-77)  However, soon after their arrival in New York, Petitioner and Respondent changed their plans, largely because they did not think it was practical to have Petitioner attend law school while pregnant.  Therefore, they moved to Toronto, Ontario, where Petitioner's parents lived. (Tr. 477)

Sol Iris was born in Toronto, Ontario on March 22, 2001.  (Pet. Ex. C)   Thereafter, Petitioner and Respondent attended the LL.M. program at the University of Toronto Law School, all the while living with Petitioner's parents and caring for Sol Iris.  (Tr. 480)  After receiving their LL.M. degrees in 2002, Petitioner and Respondent returned to Korea with the idea of making enough money to attend law school in the United States, preferably in New York.  (Tr. 481)  In Korea, Petitioner and Respondent taught English while living with Respondent's parents and caring for Sol Iris.  (Tr. 481)

### Petitioner Pursues Her Legal Career in New York City while Respondent Cares for Sol Iris in Korea

Petitioner stayed in Korea for only one year, having been accepted into law school at University at Buffalo, the State University of New York ("SUNY Buffalo").  (Tr. 481)  She began her first year in August 2003, while Respondent stayed behind in Korea.  (Tr. 481) Initially, Sol Iris lived with Petitioner's parents in Toronto.  ( Pet. Ex. C; Tr. 482)  However, by November 2003, Respondent and Petitioner agreed that Respondent should take Sol Iris to live with Respondent and his family in Korea.  (Pet. Ex. C; Tr. 483)  From November 2003 until August 2004, Respondent and his family cared for Sol Iris in Korea.  (Pet. Ex. C; Tr. 483-84)

After her first year at SUNY Buffalo, Petitioner spent the summer of 2004 as an intern at

the Legal Aid Society in New York City.[10]  (Tr. 487)  While working at Legal Aid, Petitioner

lived with Ms. Chin.[11]  (Tr. 487)  By all accounts, it appeared to be an amicable arrangement.

Indeed, Ms. Chin did not ask Petitioner to pay rent during her stay.  (Tr. 563)   It was during her

summer in New York that Petitioner became enamored with the idea of becoming an associate at

one of the City's big law firms.  (Tr. 491)  In fact, by August 2004, Petitioner had become

"crazy" about New York, in part, because of the high salaries paid by New York law firms.[12]

(Tr. 491)  This ambition was consistent with discussions that Respondent and Petitioner had

earlier in their marriage about pursuing a long-term plan to practice law and live in New York.

(Tr. 485, 489, 637)  Indeed, by August 2004, Petitioner and Respondent agreed that if Petitioner

was accepted as a transfer student to either Columbia or NYU Law School for the academic year

2004-05, she and Sol Iris would live with Respondent's aunt (Ms. Chin) in New York.[13]  (Tr.

489-90)

    Although Petitioner failed to gain acceptance at either school (but was accepted at the

University of Toronto) (Tr. 108), Petitioner took advantage of her summer in New York by

applying to several dozen New York law firms for a job in the summer of 2005.  (Tr. 491, 564-

---

[10]Petitioner learned about the Legal Aid job at a public interest job fair at NYU.  (Tr. 186, 487)

[11]During the summer of 2004, Sol Iris continued to live with Respondent in Korea.  (Tr. 487)

[12]Conversely, Petitioner complained about the lower salaries of Toronto lawyers and the high taxes in Canada.  (Tr. 555)

[13]Respondent's testimony to this effect was corroborated by Ms. Chin's testimony.  For example, Ms. Chin testified that during the summer of 2004, while Petitioner was working in New York and staying at Ms. Chin's lower Manhattan apartment, Petitioner told Ms. Chin that she wanted to live and work in New York and that Sol Iris would live in New York as well.  (Tr. 574)

65)  According to Ms. Chin, Petitioner received correspondence from 30 to 40 law firms.  (Tr. 564-65)  Though she interviewed at several firms, Petitioner was unable to secure employment from any of them.[14]  (Tr. 109, 498-99, 896)

### The Academic Year of 2004-2005: Petitioner and Respondent Attend Law School and Plan for the Future

In 2004, Respondent was accepted to law school at SUNY Buffalo and attended as a first-year student during the academic year from August 2004 until May 2005.  (Tr. 490)  Meanwhile, Petitioner attended the University of Toronto Law School as a second-year student.  During this time, Sol Iris lived with Petitioner and Petitioner's parents in Toronto.  (Pet. Ex. C; Tr. 496)  However, Respondent visited Petitioner and Sol Iris on several occasions in Toronto, the last visit occurring in April 2005.[15]  (Tr. 496-97)

Respondent had his own career interest in New York.  Indeed, from the moment he arrived at SUNY Buffalo, Respondent planned to transfer to a law school in New York, preferably NYU or Columbia.  (Tr. 489)  In the shorter term, Respondent applied for, and ultimately obtained, an internship in New York.  (Tr. 487)  From his perspective, Respondent believed that his wife could earn the salary she desired at a New York firm and he could do public interest work, all the while living with or near his family in Manhattan.  (Tr. 489, 491-92)  To that end, Respondent and Petitioner discussed the plan that both he and Petitioner would live and work in New York City during the summer of 2005.  Thereafter, Respondent could attend

---

[14]One firm that interviewed Petitioner also employs Mr. Pfeifer as an associate.  (Tr. 893)  In fact, it appears as though Mr. Pfeifer met Petitioner at a job fair during the summer of 2004 and helped arrange her interview at that firm.  (Tr. 893)

[15]In late March or early April 2005, Petitioner took Sol Iris to Montreal to visit with Mr. Pfeifer.  (Tr. 898)

NYU or Columbia, while Sol Iris lived with him at his aunt's apartment. (Tr. 492, 500-01) Under this plan, Petitioner could join them upon her graduation from the University of Toronto Law School. (Tr. 492, 500-01)

### Planning for Sol Iris to Live in New York City in the Fall of 2005

Petitioner and Respondent had numerous discussions about where Sol Iris would live after the summer of 2005. These discussions focused on where Respondent might be attending law school. At Petitioner's suggestion, Respondent applied to Georgetown University (in Washington, D.C.), because that school would consider his transfer application after only one semester and because it would be a good test case of his ability to transfer. (Tr. 501) Columbia and NYU, on the other hand, would only consider Respondent's application after he completed his entire first year of law school. (Tr. 501) Thus, he could not apply, let alone hear from, these schools until at least June or July 2005. (Tr. 501)

In mid-April 2005, Respondent called Petitioner to advise her that he had been accepted at Georgetown. (Tr. 508) After this call, Respondent visited Toronto in late April. (Tr. 508) During this visit, Respondent inquired about having Sol Iris live with him while he attended Georgetown. (Tr. 509) Petitioner expressed concern about Respondent's ability to finance the expenses of caring for Sol Iris, including child care for her in Washington, particularly since there was no family support structure in that city. (Tr. 508-09) In the end, Respondent and Petitioner did not come to an agreement regarding the Georgetown scenario. (Tr. 509) Instead, they agreed that the best option was for Respondent to gain acceptance to NYU or Columbia.[16]

---

[16]As of late April 2005, Respondent did not know where he would be attending law school in the fall. Consequently, Petitioner and Respondent pre-registered Sol Iris for junior

(continued...)

12

(Tr. 509, 531, 638)  If he did, then Sol Iris would live with Respondent in New York and

Petitioner could move to New York after graduating from the University of Toronto.  (Tr. 500-01, 508)

To permit Sol Iris to live for a lengthy period of time with Respondent, who was in the

United States on an F-1 visa, Sol Iris would need to obtain an F-2 visa.  (Tr. 514)  This was

discussed during the late April 2005 visit in Toronto.[17]  (Tr. 515)  Petitioner also mentioned the

F-2 visa several other times, including in a June 2005 email to Respondent, where she inquired if

Respondent had "prepared" the F-2 visa for Sol Iris's "extended stay in New York City," or

wherever Respondent ended up attending law school.[18]  (Tr. 236)

---

[16](...continued)
kindergarten in Toronto.  (Tr. 118-19, 442)

[17]Petitioner gave conflicting testimony as to the necessity of an F-2 visa.  At one point
during her testimony, Petitioner claimed that Sol Iris would require an F-2 visa to enter the
United States with Respondent, who had only an F-1 visa.  (Tr. 222)  Yet, when pressed on
cross-examination, Petitioner ultimately admitted that an F-2 visa was not required for Sol Iris to
enter the United States when traveling with Respondent.  (Tr. 435)

Indeed, Petitioner's direct testimony makes little sense in the context of the discussions
between Respondent and Petitioner during late April 2005.  For example, even though
Respondent had been living in the United States during his first year at SUNY Buffalo, Sol Iris
never went to visit him.  All the visits during the 2004-2005 academic year involved Respondent
traveling to Toronto.  It was only after Petitioner and Respondent discussed Sol Iris living with
Respondent that the F-2 issue arose.  Thus, Respondent's explanation – that Sol Iris would need
the F-2 visa to stay in the United States longer than six months – not only makes sense, but
supports his side of the story.  His explanation also is consistent with the law, as Sol Iris, a
Canadian citizen, would not require an F-2 visa to enter the United States, but would require one
if she intended to stay longer than six months.  *See* 8 C.F.R. § 212.1 (noting that a Canadian
citizen may enter the United States without a visa); 8 U.S.C. §§ 1101(a)(15)(B),
1101(a)(15)(F)(ii) (discussing requirements of F-2 visa for extended stay in the United States).

[18]Counsel for Petitioner attempted to score points by getting Respondent to admit that as
of the hearing he had not yet procured the F-2 visa.  (Tr. 672)  This is a red herring.  Respondent
could not have applied for the visa until his acceptance at a law school.  (Tr. 516)  Because this
process required extensive paperwork and Sol Iris's passport, which Respondent could not have

(continued...)

**The Summer of 2005: Internship in Cambodia and Acceptance into Columbia**

The initial plan to live together in New York during the summer of 2005 faltered after Petitioner could not gain employment at a New York firm. In February 2005, Petitioner turned her attention to an internship in Cambodia. (Tr. 502) Initially, Respondent was opposed to Petitioner traveling to Cambodia and leaving Sol Iris behind in Canada.[19] (Tr. 502) When Petitioner's parents refused to care for Sol Iris that summer, Petitioner asked Respondent if he would join them in Cambodia. Respondent was unwilling to do so. (Tr. 121, 504) Failing that, Petitioner asked Respondent to live in Toronto and care for Sol Iris there. (Tr. 504) Initially, Respondent resisted that idea as well, but later relented. (Tr. 504) By the time he changed his mind, however, Petitioner indicated that she would take Sol Iris with her to Cambodia for the summer.[20] (Tr. 505)

---

[18](...continued)
obtained prior to Petitioner's arrival on August 2, 2005, there is nothing significant about the fact that Respondent had not yet obtained the F-2 visa for his daughter.

Indeed, Respondent testified at length about the efforts he made to complete the paperwork and otherwise satisfy the requirements for the F-2 visa. (Tr. 516-17, 524) This credible testimony supports Respondent's case as it shows that he was acting diligently to carry out the plan he and Petitioner made in April 2005.

[19]In response to Respondent's complaints about taking Sol Iris to Cambodia, Petitioner sent Respondent an email where she expressed her belief that it was not "completely bad" for Sol Iris "to travel around the world 'with' her mother." (Respt.'s Ex. D) According to Petitioner, "I want to show her the world, and as I said, I have no intention to raise her here in Canada." (Respt.'s Ex. D) Before being shown this email, Petitioner testified that she intended to work and live in Toronto after graduating from law school and that she intended to raise Sol Iris in Canada. (Tr. 116) Petitioner's February 19, 2005 email demonstrates that her testimony to this Court was false.

[20]Ms. Chin agreed to have Respondent and Sol Iris live with her, and she even researched day care centers near her apartment. (Tr. 506-07)

Petitioner left for Cambodia on May 16, 2005, reluctantly bringing Sol Iris with her.[21] (Petr.'s Ex. 11; Tr. 203)  Prior to the trip, Petitioner and Respondent agreed they would stay in touch, mostly through email.  (Tr. 203, 510)  Within weeks of Petitioner's arrival in Phnom Penh, Cambodia, Sol Iris became very sick, suffering from such a high fever that Petitioner and Respondent considered options for her removal from Cambodia.  (Tr. 205-06, 510-11)  One possibility was to have Respondent's brother bring Sol Iris from Cambodia to New York.  In an email dated June 11, 2005, Petitioner rejected that idea in part because she was unsure that Respondent's brother would be able to enter the United States without securing a tourist visa for Sol Iris.  (Respt.'s Ex. E)  On that topic, Petitioner asked Respondent if he had Sol Iris's "paperwork ready," referring to the F-2 visa (Tr. 219-20), and specifically noted that she would "drop her [Sol Iris] at nyc anyway on Aug.2."[22]  (Tr. 223)  In the June 11, 2005 email, Petitioner

---

[21]Before Petitioner and Sol Iris departed, Respondent signed a "Parental Consent Letter," stating in essence that he was the father of Sol Iris and that he consented to her travel with Petitioner from Canada to Cambodia between May 16, 2005 and August 3, 2005.  (Petr.'s Ex. 3)  Petitioner contends that this reflects Respondent's consent to have Petitioner return to Canada with Sol Iris.  (Petr.'s Aff. ¶ 5, Aug. 8, 2005; Petr.'s Mem. of Law on the Hague Convention on the Civil Aspects of Int'l Child Custody 3, Aug. 30, 2005 [hereinafter Petr.'s Post-Hr'g Mem.])  However, this form was merely meant to reflect Respondent's consent for Sol Iris to travel with Petitioner to Cambodia.  In fact, Respondent recounted his difficulties entering Canada with Sol Iris without such a consent form.  (Tr. 515)  Furthermore, there is nothing in the form reflecting Respondent's consent for Sol Iris to live with Petitioner beyond the duration of the Cambodia trip.  In fact, at the time he signed the consent, Respondent did not yet know if he had been accepted into NYU or Columbia, thus there would have been no reason for him to give such consent.

[22]This email further undercuts Petitioner's efforts to limit the F-2 visa as relating only to Respondent's ability to enter the United States with Sol Iris.  If that was the sole purpose of the F-2 visa, and if Petitioner already had determined that *she* would "drop off" Sol Iris with Respondent in New York, then there would be no need for an F-2 visa.  Instead, the more logical conclusion is that this email reflects the prior agreement that Respondent would obtain an F-2 visa for Sol Iris so she could stay with him for a period longer than six months while he attended

(continued...)

also stated that she was "upset" that Respondent now wanted to relieve Petitioner of having to care for Sol Iris in light of his earlier suggestion that Petitioner should bring Sol Iris "to this lawless, isolated place without a realiable [sic] medical facility . . . where [Petitioner] has to think about the possibility of malaria and danngue [sic] fever for every single mosquito bite." (Respt.'s Ex. E) She ended the June 11, 2005 email by providing Respondent with telephone contact information.

After this email, Respondent lost contact with Petitioner and his daughter for several weeks.[23] (Tr. 511) This is because Mr. Pfeifer came to visit Petitioner for a week in Phnom Penh (Tr. 214), and then Petitioner, Mr. Pfeifer, and Sol Iris traveled to the Northern Territory of Cambodia together.[24] (Tr. 215-16) Petitioner did not tell Respondent about this trip, or of her relationship with Mr. Pfeifer. (Tr. 215) Instead, after her sojourn with Mr. Pfeifer, Petitioner sent an email to Respondent saying that she wanted a divorce. (Tr. 511) In response, Respondent suggested that they talk about a divorce in person in New York. (Tr. 512) Petitioner tersely replied that there was no need to discuss the topic, that she wanted a divorce by

---

[22](...continued)
law school in New York.

[23]The loss of contact greatly concerned Respondent, who did not know if Sol Iris had recovered fully from her high fever. On June 19, 2005, he wrote in an email:

> How is Sol?? Still running a fever?? I am worried so much; I assume you are as well. How much would it cost for you to bring Sol to the States?? I would think that's the best option, and I would at least like to know if it is feasible. Thanks for taking care of Sol.

(Respt.'s Ex. F)

[24]Apparently, this trip had been planned as far back as April 2005. (Tr. 215)

October, and that if Respondent did not comply, Petitioner would take Respondent to criminal court in Ontario. (Tr. 512) Petitioner also told Respondent that she would not be reachable for the next three weeks. (Tr. 518) At some point thereafter, Petitioner sent Respondent an email indicating that she would arrive in New York on August 2, 2005. (Tr. 518)

In late July, Respondent learned that he had been accepted into Columbia Law School. (Tr. 516) Within a week, he began to make arrangements to procure the F-2 visa for Sol Iris. (Tr. 516) For example, Respondent inquired about documents he would need to complete and secured the necessary funding from his father. (Tr. 516-17) One document Respondent needed to procure was Sol Iris's passport. (Tr. 524)

While Respondent was pursuing Sol Iris's F-2 visa, Ms. Chin and her husband visited a day care center near their lower Manhattan residence. (Tr. 517-18, 567-68) To accommodate Sol Iris's indefinite stay in New York while Respondent attended Columbia law school, Ms. Chin also made substantial alterations to her apartment. (Tr. 518, 569) For example, she moved out of her larger bedroom, moved Sol Iris's bed into that bedroom, had Sol Iris's bedroom thoroughly cleaned, and she and her daughter (Andrea) bought books and toys for Sol Iris. (Tr. 569)

### August 2, 2005: Petitioner Drops Sol Iris Off in New York City

As planned, Petitioner and Sol Iris flew into JFK International Airport on August 2, 2005. Respondent and his brother met them at the airport. (Tr. 237) From the airport, Respondent, his brother, Petitioner, and Sol Iris took a taxi to Ms. Chin's apartment in lower Manhattan. During this ride, Respondent commented on the physical condition of Sol Iris. She

appeared to be missing most of a toenail and had numerous large mosquito bites on her legs.[25] (Tr. 519)  Respondent then insisted that Sol Iris see a doctor in New York the next day.  (Tr. 521)

Respondent thereafter advised Petitioner that he had been accepted into Columbia Law School.  Respondent then asked Petitioner if she still agreed to Sol Iris living with Respondent in New York. (Tr. 519-20)  Petitioner agreed.  (Tr. 519-20)  In fact, Petitioner said, "wow she's [Sol Iris] going to be a New Yorker now."  (Tr. 239)

During the same ride, Respondent asked Petitioner how long she was planning to stay in New York.  (Tr. 520)  Petitioner indicated she would be staying until that Saturday (August 6, 2005).  (Tr. 520)  Respondent then asked Petitioner if she would be staying with Respondent's family at Ms. Chin's apartment, but Petitioner indicated that she would be staying with a friend. (Tr. 520)

Eventually, Respondent, Petitioner, Sol Iris, and Respondent's brother arrived at Ms. Chin's apartment.  (Tr. 520)  Petitioner stayed approximately three to four hours.  (Tr. 286, 520) During this visit, Petitioner presented gifts to Respondent's family that she brought from Cambodia.  (Tr. 285-86, 522)  Respondent and his brother unpacked Sol Iris's belongings into a cabinet in the room that Ms. Chin had set up for Sol Iris's indefinite stay.  (Tr. 521-22)  At some point during this brief visit, Ms. Chin showed Petitioner the changes she made to the apartment to accommodate Sol Iris.  Ms. Chin also told Petitioner about her research about the neighborhood day care center.  (Tr. 577)

_____

[25]Petitioner claimed that Sol Iris hurt her toe when she slipped.  (Tr. 519)  The toenail had been manicured during a visit by Petitioner to a beauty salon in Cambodia.  (Tr. 519, 296)

During this visit, Respondent and Petitioner had another brief conversation about the care of Sol Iris. According to both Respondent and Ms. Chin, Petitioner agreed that Respondent would care for Sol Iris in New York while she lived with Respondent and his family at Ms. Chin's apartment. (Tr. 523-24, 579) Petitioner's version is different, but not credible. She testified that she told Ms. Chin that she "will be the one who takes Iris back to Toronto, that whoever gets the custody order . . . should have the full custody . . . and . . . divorce and custody are separate issue[s]." (Tr. 286-87) To the extent one can decipher the precise meaning of Petitioner's testimony on this point, it appears that she believes she never agreed to give *permanent* custody of Sol Iris to Respondent.[26] (Tr. 284)

---

[26]Also, at some point on August 2, 2005, Respondent asked Petitioner to give him Sol Iris's passport, which he needed for the F-2 visa application. (Tr. 524) Petitioner said she would provide it to Respondent. (Tr. 524) This testimony is entirely credible since it is obvious that Respondent would need Sol Iris's passport to obtain the F-2 visa.

Respondent's credible explanation is in stark contrast to Petitioner's incredible testimony about the passport. At the *ex parte* hearing, Petitioner attempted to portray the passport request as part of some nefarious plot by Respondent to abscond with Sol Iris to Korea. Indeed, Petitioner tried to cast a dark cloud over the passport request by testifying that Respondent asked for the passport immediately upon her arrival on August 2, 2005 and again on August 3, 2005 in order to take Sol Iris to the doctor, something that Petitioner then suggested was an obvious pretext. (Tr. 27, Aug. 12, 2005) Petitioner went on to insinuate that Respondent only asked for the passport in connection with the F-2 visa for the first time on August 5, 2005. (Tr. 27, Aug. 12, 2005) This testimony, however, is difficult to square with the email Petitioner sent to Respondent in June 2005, two months before her arrival in New York, in which she specifically asked Respondent about the "paperwork" (the F-2 visa). (Respt.'s Ex. E) It is also contrary to the credible testimony of Respondent and common sense that the passport was necessary for the F-2 visa.

Concealing the fact that Respondent was interested in obtaining Sol Iris's passport in order to obtain the F-2 visa does more than just undermine Petitioner's credibility; it also supports an inference that she misled the Court because she knows the F-2 visa is proof that she consented to let Sol Iris live with Respondent in New York upon his acceptance to Columbia. *Cf. United States v. Aleskerova*, 300 F.3d 286, 297 (2d Cir. 2002) (stating that lying to customs officials regarding possession of paintings tends to prove plaintiff's consciousness of guilt); *S.E.C. v. Cassano,* 61 F. Supp. 2d 31, 34 (S.D.N.Y. 1999) (finding that lying to SEC

(continued...)

After this conversation, Respondent and his brother took Sol Iris to a local playground. (Tr. 524)  At some point thereafter, Ms. Chin, upon being told by Petitioner that she planned to be in New York for four more days, invited Petitioner to stay with her or her daughter.  (Tr. 575)  Petitioner declined, stating that she had a friend who was expecting her.  (Tr. 575)  When Ms. Chin asked about the friend, Petitioner told Ms. Chin that her friend lived in Chelsea and that he was a man.  Petitioner whispered to Ms. Chin that Respondent did not know that her friend was a man.[27]  (Tr. 575)  Also, while Ms. Chin and Petitioner were alone in Ms. Chin's apartment, Petitioner spoke to her parents over the telephone.  After this conversation, Petitioner told Ms. Chin that she had falsely told her mother during that conversation that she was not going to divorce Respondent.  (Tr. 578-79)

Petitioner gave different versions of her story that she was not allowed to stay with Ms. Chin.  At the *ex parte* hearing on August 12, 2005, Petitioner claimed that "they said there is no room for me to stay in that house."  (Tr. 26, Aug. 12, 2005)  During cross-examination, however, she altered her story, claiming that Ms. Chin told her in 2004 that while Petitioner was always welcome in her house as the mother of Sol Iris, she would not let Petitioner stay in her two-bedroom apartment when Respondent's brother "comes in."  (Tr. 282-83)  Thus, according to Petitioner, when she arrived at Ms. Chin's apartment on August 2, 2005, Ms. Chin asked Petitioner where she was "going," and that when Petitioner said she was going to a friend's house, Ms. Chin said "good."  (Tr. 283)  Petitioner evidently told her parents another story,

---

[26](...continued)
investigators about the circumstances of stock trades evidences knowledge of guilt).

[27]Mr. Pfeifer admitted that Petitioner stayed with him that night.  (Tr. 872)

claiming that Ms. Chin asked Petitioner to leave her apartment on August 2, 2005. (Tr. 580)

Petitioner's story is simply not credible. The claim that Ms. Chin and Petitioner had an apparently hypothetical conversation – one year before the August 2 visit – about Petitioner being allowed to stay with Ms. Chin except in the event that Respondent's brother just happened to be visiting from Korea is absurd. Thus, even if Petitioner had not changed her story, this initial tale is not credible on its face. Further, Petitioner changed her story both to this Court and evidently to her parents (to whom she also lied about her intentions to divorce Respondent). Petitioner's testimony was no match for the credible, even if angry, denials by Ms. Chin that she never told Petitioner she was unwelcome at her home.[28] In the end, it is readily apparent that Petitioner never intended to stay with Ms. Chin and instead was eager to stay and visit with her boyfriend, Mr. Pfeifer.[29] Indeed, Petitioner told Respondent *before* she arrived at Ms. Chin's

---

[28]Upon learning that Petitioner had told her parents that Ms. Chin had asked Petitioner to leave her apartment, Ms. Chin sent Petitioner's parents an email categorically rejecting Petitioner's claims. (Respt.'s Ex. N) It is noteworthy that this email, written on August 11, 2005, and before Petitioner initiated this case, describes the August 2 conversation between Ms. Chin and Petitioner almost identically to Ms. Chin's testimony on the same topic. (Respt.'s Ex. N) ("I invited her to bunk with U.S. but she said, 'my friend is expecting me.' Then, she whispered to me later that her 'friend' is a man.")

[29]There is no question that Petitioner was carrying on an extramarital affair with Mr. Pfeifer from as far back as 2004 until August 2005. Indeed, Mr. Pfeifer admitted to: (i) interviewing Petitioner in the fall of 2004 for a law job and maintaining contact with her thereafter (Tr. 892, 897); (ii) traveling to Montreal to spend a weekend with Petitioner (and Sol Iris) in late March 2005 (Tr. 898); (iii) traveling to Cambodia to spend a week with Petitioner, all the while staying with her (and Sol Iris) at a bed and breakfast and at Petitioner's apartment (Tr. 875-76); (iv) having Petitioner stay with him during her visit to New York between August 2 and August 12, 2005 (Tr. 872-74); and (v) hugging Petitioner in front of Sol Iris. (Tr. 892) Thus, although Mr. Pfeifer repeatedly invoked his right against self-incrimination (because of a fear of prosecution under New York's adultery statute) (Tr. 881, 882, 884, 897), the Court fairly can draw the inference that Mr. Pfeifer and Ms. Choi were engaged in an affair for nearly one year. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid

(continued...)

apartment that she would be staying with a friend. (Tr. 520) Thus, Petitioner's decision to stay with Mr. Pfeifer had nothing to do with anything Ms. Chin said to her.[30]

### August 3 and 4, 2005: Sol Iris Visits the Doctor and Petitioner Disappears

On August 3, 2005, Respondent took Sol Iris to the emergency room at NYU Hospital, but she was refused care. (Tr. 525) Thereafter, Petitioner called Respondent, learned about the failed ER visit, and indicated she would try to find the name of a doctor. (Tr. 525) Petitioner later met Respondent at Ms. Chin's apartment, where she provided the name of a doctor (given to her by Mr. Pfeifer). (Tr. 525, 305-06) While at Ms. Chin's apartment, Petitioner spoke with Ms. Chin and told her that she wanted to find a job in New York during her visit, and that she was interested in returning to Cambodia during the summer of 2006. (Tr. 575-76)

Later that day, Respondent, Petitioner, and Respondent's brother took Sol Iris to the doctor, who prescribed medicine for Sol Iris's wounds. (Tr. 526) Respondent filled the prescription.[31] (Tr. 526) At some point during that day, Respondent again asked for Sol Iris's

---

[29](...continued)
adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Nolan v. Nolan*, 486 N.Y.S.2d 415, 418 (App. Div. 1985) ("Because plaintiff availed herself of her Fifth Amendment right against self-incrimination when questioned regarding an alleged adulterous relationship, we believe that Trial Term properly inferred marital misconduct on her part."). While Petitioner did not invoke her Fifth Amendment right, her counsel indicated she would invoke the right if asked direct questions about any sexual relations with Mr. Pfeifer. (Tr. 175, 183)

[30]This recitation is significant because, in support of Petitioner's request for a Warrant in lieu of a Writ for Habeas Corpus, Petitioner attempted to paint a picture in which Respondent had blocked Petitioner from having any contact with Sol Iris, thus, in effect, kidnaping her. (Tr. 8, 14, 28, Aug. 12, 2005) Yet, after a full hearing, it seems clear that there was no such effort by Respondent or his family.

[31]The parties dispute who paid for the prescription, a clash that need not be resolved for these purposes.

passport, which Petitioner said she would provide.  (Tr. 532)  Also on August 3, Respondent,

Petitioner, and Respondent's brother took Sol Iris to a department store to purchase some

clothes.  (Tr. 532)  Petitioner left her daughter and Respondent at the department store, saying

that she had dinner plans.  (Tr. 532)  Continuing the same pattern of behavior, Petitioner did not

call or visit Respondent or Sol Iris on August 4, 2005.

### August 5 and 6, 2005:  Petitioner Changes Her Mind

On August 5, 2005, Petitioner had no contact with Respondent until she sent an email at

approximately 9 p.m.  The email in its entirety reads as follows:

> I may extend my stay till Tuesday, as i haven't had anytime to sit
> down and talk about iris.  i am fully booked today with lunch and
> dinner meetings. i will be free from tomorrow.
>
> my heart is breaking to part her, and that is my personal interest.
> honestly, i don't know whether it is good for her to stay here. the
> more i get to know nyc, i believe that it may be better for her to
> stay with me till she reaches age of 5 and after you have fully
> settled with your school and live in nyc.  but i don't want to argue
> over ths over the internet and i would like to talk or at least express
> my thoughts.
>
> i also think it would be better to finalize divorce while i am here
> rather than make double, triple trips.  please let me know whether
> it is okay to book an appointment on Monday or Tuesday with the
> consulate office.
>
> I hope her wounds are now better and hope to see you soon.

(Respt.'s Ex. I) (errors in original)

The next morning, Petitioner called Andrea Chin, the daughter of Ms. Chin, to request a

meeting with Respondent.  (Tr. 533-34)  Andrea Chin told Petitioner that the family was going to

have lunch at a Korean restaurant.  (Tr. 534)  Petitioner thereafter met Respondent, Sol Iris, and

Respondent's family at the restaurant.  (Tr. 534)  The lunch was followed by a conversation

23

between Respondent and Petitioner.  Petitioner led by saying that she wanted to take Sol Iris back to Toronto and that Sol Iris could return to New York after her fifth birthday (in March 2006).  (Tr. 536)  Respondent expressed his frustration with Petitioner changing her mind and explained why it was in Sol Iris's interest that she not move back and forth between the parents. (Tr. 536-37)  Respondent also told Petitioner that he had adequate financial support from his father, something that seemed to put Petitioner somewhat at ease.  (Tr. 537)  Petitioner then conceded that Sol Iris would stay in New York, but she wanted to have joint custody over her. (Tr. 537)  Respondent rejected this suggestion, claiming that it was impractical for Petitioner to have custody rights from a distance.  (Tr. 537)  At this point, Petitioner indicated that she wanted to move to New York to be close to Sol Iris and, in fact, that she had been trying to meet with people during her stay in New York to obtain employment.  (Tr. 537-38)

### August 7 to 11, 2005:  Petitioner Turns up the Heat

On August 7, 2005, Petitioner and Respondent had no meetings or conversations. Petitioner sent another email to Respondent late in the evening of August 7, which reads as follows:

> After careful thought, I am going back home with Iris this Saturday or earlier.  As you know, my family and I have already prepared housing and Iris' junior kindergarten.
>
> I appreciate your relatives' love and care this week.  Thank you.
>
> If you decide to interfere, I will contact the appropriate authorities and inform my legal counsel.
>
> I trust that you would not take a wrongful step which may jeopardize all three of our lives.
>
> We can talk about the detailed arrangement after me and Iris go back to Canada and settle in.

24

> If you will not finalize the divorce this week in New York, I will
> initiate divorce proceedings in Canada.
>
> Because you mentioned you are available to go to consulate on
> Wednesday, I look forward to speaking to you there and then.[32]

(Petr.'s Ex. 5)

The next day, Respondent and Petitioner spoke by phone. (Tr. 341) During the call,

Petitioner told Respondent that she was coming to Ms. Chin's residence to get Sol Iris. (Tr. 544)

Respondent said that Petitioner could come to the apartment, but not if her intention was to take

Sol Iris. (Tr. 544) He also objected to Petitioner's threat to bring law enforcement officials to

Ms. Chin's apartment, particularly because she had been nice to Petitioner. (Tr. 341, 543)

Petitioner indicated that she would call back, but she did not, either that night or the next day.

Instead, Petitioner contacted the police. (Tr. 341-42) The police met Petitioner out on the street,

near Respondent's residence. (Tr. 345, 874) They referred Petitioner to the appropriate precinct.

(Tr. 345)

The next day, August 9, 2005, Petitioner went to the Canadian consulate. (Tr. 347)

Petitioner also called the 1st Precinct on August 9, but they offered no assistance. (Tr. 347)

Petitioner had no contact with Respondent on August 9. (Tr. 544)

On August 10, Michael D. Stutman, an attorney, apparently retained by Petitioner, had a

letter served on Respondent. (Tr. 545) Mr. Stutman began his letter by commenting that in light

of Respondent's "circumstances (present in this country on a student visa and hoping to apply

---

[32]Notwithstanding his waffling during the hearing (Tr. 907-11), it is evident that Mr. Pfeiffer assisted Petitioner with this email. Indeed, a cursory comparison of the August 5 and August 7, 2005 emails leaves no doubt, as the former is filled with typographical and grammatical errors and the latter is not.

for admission to the Bar of New York)," he found Respondent's conduct "to be astonishing." (Petr.'s Ex. 7)  Mr. Stutman further wrote that certain "proceedings" could be brought under "Federal and State statutes to obtain custody of" Sol Iris and to "punish" Respondent for his actions.  (Petr.'s Ex. 7)  The letter warned Respondent that these proceedings would be public and would be considered when Respondent applies for "a license to practice law in this or any other State."  (Petr.'s Ex. 7)  The letter ended by demanding that Respondent return Sol Iris to Petitioner on August 11, 2005 at a Starbuck's in midtown Manhattan, or else Petitioner would be advised "to pursue every single remedy available to her."  (Petr.'s Ex. 7)

Upon receiving this letter, Respondent contacted a law professor and attempted to retain a family lawyer.  (Tr. 545)  Later that night, Respondent called Petitioner asking her about the letter he received.  (Tr. 546)  Petitioner repeatedly insisted that Respondent agree to give Sol Iris back to her.  (Tr. 546)  Toward the end of the conversation, Petitioner asked to speak with Sol Iris.  However, when Respondent asked Sol Iris to speak with Petitioner Sol Iris refused because, contrary to Petitioner's testimony, Sol Iris was preoccupied with her toys.  (Tr. 546, 720)

August 11 found both Respondent and Petitioner in New York State family court filing competing actions for custody over Sol Iris.  (Tr. 547)  Petitioner, represented by counsel in this action, filed both a Hague Convention petition and an amended petition for custody of Sol Iris.  (Respt.'s Ex. A; Ex. B)  Respondent, representing himself, filed a custody petition.  (Tr. 547-48; Respt.'s Ex. M)  Both parties appeared briefly before a referee, who adjourned the matter until August 17, 2005.[33]  (Tr. 550-51)

---

[33]During the *ex parte* hearing, Petitioner's counsel failed to mention to the Court that he had filed an action in New York Family Court and he represented to this Court that he was

(continued...)

for admission to the Bar of New York)," he found Respondent's conduct "to be astonishing." (Petr.'s Ex. 7)  Mr. Stutman further wrote that certain "proceedings" could be brought under "Federal and State statutes to obtain custody of" Sol Iris and to "punish" Respondent for his actions.  (Petr.'s Ex. 7)  The letter warned Respondent that these proceedings would be public and would be considered when Respondent applies for "a license to practice law in this or any other State."  (Petr.'s Ex. 7)  The letter ended by demanding that Respondent return Sol Iris to Petitioner on August 11, 2005 at a Starbuck's in midtown Manhattan, or else Petitioner would be advised "to pursue every single remedy available to her."  (Petr.'s Ex. 7)

Upon receiving this letter, Respondent contacted a law professor and attempted to retain a family lawyer.  (Tr. 545)  Later that night, Respondent called Petitioner asking her about the letter he received.  (Tr. 546)  Petitioner repeatedly insisted that Respondent agree to give Sol Iris back to her.  (Tr. 546)  Toward the end of the conversation, Petitioner asked to speak with Sol Iris.  However, when Respondent asked Sol Iris to speak with Petitioner Sol Iris refused because, contrary to Petitioner's testimony, Sol Iris was preoccupied with her toys.  (Tr. 546, 720)

August 11 found both Respondent and Petitioner in New York State family court filing competing actions for custody over Sol Iris.  (Tr. 547)  Petitioner, represented by counsel in this action, filed both a Hague Convention petition and an amended petition for custody of Sol Iris.  (Respt.'s Ex. A; Ex. B)  Respondent, representing himself, filed a custody petition.  (Tr. 547-48; Respt.'s Ex. M)  Both parties appeared briefly before a referee, who adjourned the matter until August 17, 2005.[33]  (Tr. 550-51)

---

[33]During the *ex parte* hearing, Petitioner's counsel failed to mention to the Court that he had filed an action in New York Family Court and he represented to this Court that he was

(continued...)

26

A.    General Principles

The Hague Convention on the Civil Aspects of International Child Abduction, as implemented through ICARA, was created with the stated purpose "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  Hague Convention, *supra*, at intro.  The Convention was designed to restore the pre-retention *status quo* and to discourage parents from crossing international borders in search of a more sympathetic forum.  *See Gitter v. Gitter*, 396 F.3d 124, 129-30 (2d Cir. 2005) (citing Paul R. Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 1-3 (P.B. Carter ed1999) [hereinafter Beaumont & McEleavy]).  To dissuade family members from removing children to jurisdictions perceived to be more favorable to their custody claims, the Hague Convention attempts "to deprive [their] actions of any practical or juridical consequences." *Gitter*, 396 F.3d at 130 (quoting *Hague Convention on the Civil Aspects of Int'l Child Abduction:  Explanatory Report,* ¶ 16, Acts and Documents of the 14th Session, vol. III (1980) (*prepared by* Elisa Perez-Vera) [hereinafter *Perez-Vera Report*].

A court considering a Hague Convention petition has jurisdiction only over the wrongful removal or retention claim.  *See* Hague Convention, *supra*, at art. 16; 42 U.S.C. § 11601(b)(4); *Diorinou v. Mezitis*, 237 F.3d 133, 140 (2d Cir. 2001).  The merits of any underlying custody

---

[33](...continued)
unaware of the return date for Respondent's Family Court action.  Obviously, this omission and false statement are troubling.

case are of no concern in a Hague Convention case. *See Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999) (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*")); Hague Convention, *supra*, art. 19. "Put differently, the court's inquiry in a Hague Convention case is not 'the best interests of the child,' as it is in a state custody case; rather it is the specific claims and defenses under the Convention, namely whether a child has been wrongfully removed to, or retained in, a country other than the child's habitual residence and, if so, whether any of the Convention's defenses apply to bar the child's return to his habitual residence." *Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 610-11 (E.D. Va. 2002).

ICARA, enacted in 1988, establishes procedures for the implementation of the Hague Convention in the United States. *See Croll v. Croll*, 229 F.3d 133, 138 (2d Cir. 2000). ICARA allocates the burdens of proof for various claims and defenses under the Convention. *See* 42 U.S.C. § 11601-11611 (2005); *Koc v. Koc*, 181 F. Supp. 2d 136, 146 (E.D.N.Y. 2001). Specifically, ICARA requires that a petitioner establish, by a preponderance of the evidence, that the child whose return is sought has been "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). In this respect, the Convention reflects "a strong presumption favoring return of a wrongfully removed child." *Danaipour v. McLarey*, 286 F.3d 1, 13 (1st Cir. 2002). If a petitioner makes out a *prima facie* case of wrongful removal or retention, the court must return the child unless the respondent can establish one of the Convention's enumerated defenses. *Hazbun Escaf*, 200 F. Supp. 2d at 611.

To establish a *prima facie* case of wrongful retention under the Hague Convention, a petitioner must show by a preponderance of the evidence that: (1) the habitual residence of the child immediately before the date of the alleged wrongful retention was in a foreign country; (2)

the retention is in breach of custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the alleged wrongful retention.  *See* 42 U.S.C. § 11603(e)(1)(A); *Gitter*, 396 F.3d at 130-31.

If the petitioner satisfies this burden, then the child must be returned to his or her state of habitual residence unless the respondent can establish one of the following affirmative defenses: (1) the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment; (2) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention; (3) there is a grave risk that the return of the child would expose it to physical or psychological harm; or (4) the return of the child would not be permitted under the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.[34]  *See Blondin*, 189 F.3d at 245-46; *Furnes v. Reeves*, 362 F.3d 702, 712 (11th Cir. 2004).

However, as is clear from ICARA, these affirmative defenses are meant to be narrow. *Blondin*, 189 F.3d at 246.  Indeed, these defenses "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody."  *Id.*; *see also Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) ("It is not relevant to this Convention exception [Article 13(b)] who is the better parent in the long run . . . .").  To view the defenses more broadly would frustrate the core purpose of the Hague Convention – to preserve the *status quo* and deter parents from seeking custody of their child through forum

---

[34]The first two affirmative defenses require a preponderance of the evidence, the last two affirmative defenses require clear and convincing evidence.  *Blondin*, 189 F.3d at 245-46.

shopping.  *See Perez-Vera Report*, *supra*, ¶ 34.

B.      The Prima Facie Case of Wrongful Retention

1.      Habitual Residence

A petitioner can invoke the protection of the Hague Convention only if the child to whom the petition relates is "habitually resident" in a State signatory to the Convention and has been removed to or retained in a different State.  *See Holder v. Holder*, 392 F.3d 1009, 1014 (9th Cir. 2004); *Diaz Arboleda v. Arenas*, 311 F. Supp. 2d 336, 342 (E.D.N.Y. 2004).  The Hague Convention itself, however, does not provide any definition of "habitually resident."  *Gitter*, 396 F.3d at 131; Beaumont & McEleavy, *supra*, at 89; *Perez-Vera Report*, *supra* ¶ 53 ("Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms . . . .").

Although "habitual residence" is not defined in the Convention, the text of the Convention directs courts to the time "immediately before the removal or retention."  Hague Convention, *supra*, art. 3; *see also Slagenweit v. Slagenweit*, 841 F. Supp. 264, 268 (N.D. Iowa 1993) ("In determining habitual residency, 'a court must look back in time, not forward . . . . Future plans are irrelevant to our inquiry.'") (quoting *Friedrich I*, 983 F.2d at 1401) (ellipses in original).

In focusing on the pre-retention period, the relevant inquiry is the shared intention of those responsible for fixing the child's place of residence, which typically will be the child's parents.  *See Gitter*, 396 F.3d at 132.  The Court may also look to other factors in determining the child's habitual residence.  *Id.* at 133.  ("[P]arental intent cannot alone establish a child's habitual residence.")  "First, a change in geography is a necessary condition to a child acquiring

30

a new habitual residence." *Gitter*, 396 F.3d at 133; *see also Diaz Arboleda*, 311 F. Supp. 2d at 342. Second, there must be evidence that "points unequivocally to the conclusion that the child has become acclimatized to his new surroundings and that his habitual residence has consequently shifted." *Gitter*, 396 F.3d at 133; *see also Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001) ("[T]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind."). However, so as not to undermine the goal of the Hague Convention to deter "gamesmanship" among adversarial parents, the courts should be "'slow to infer' that the child's acclimatization trumps the parents' shared intent." *Gitter*, 396 F.3d at 134 (quoting *Mozes*, 239 F.3d at 1079).

Petitioner claims that Sol Iris is a habitual resident of Canada.[35] (Petr.'s Post-Hr'g Mem. 9-14) In support of this claim, Petitioner points to the birth of Sol Iris on Canadian soil and broadly asserts that she has been "mostly raised in Canada." (Petr.'s Post-Hr'g Mem. 10) Beyond these points, Plaintiff claims, and Respondent does not dispute, that as of August 2004 there was a shared intent between Petitioner and Respondent to have Petitioner care for Sol Iris during the academic year from August 2004 until May 2005 in Canada. (Petr.'s Post-Hr'g Mem. 9) Petitioner further contends, however, that she and Respondent also agreed, as of April 2005, that Petitioner would take Sol Iris to Cambodia during the summer and then the two would return to Canada for the academic year August 2005 through May 2006. (Petr.'s Post-Hr'g Mem. 9-10) In support of this contention, Petitioner points to Respondent's acquiescence to two of

---

[35]There is no dispute that Canada and the United States are signatories to the Hague Convention. *See Hague Conference on Int'l Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of Int'l Child Abduction*, 1980, 33 I.L.M. 225, 225 (1994).

Petitioner's decisions in April 2005 – one registering Sol Iris for junior kindergarten in Toronto beginning in September 2005 and the other traveling with Sol Iris to Cambodia and back to Canada. (Petr.'s Post-Hr'g Mem. 9-10)

Respondent posits a different theory. His claim is that Petitioner has simply failed to meet her burden of demonstrating that Canada is Sol Iris's habitual residence and that, in fact, she is without any habitual residence. Respondent disputes Petitioner's claim that she always intended to raise Sol Iris in Canada, insists that they had agreed Sol Iris would live in New York with Respondent should he be accepted into law school there, points to Petitioner's emails discussing the procurement of an F-2 visa for Sol Iris and Petitioner's intention to "drop" Sol Iris in New York, and highlights Petitioner's comment about Sol Iris becoming a New Yorker on August 2, 2005.[36] (Respt.'s Ex. E; Tr. 236, 239, 282) The weight of this evidence, according to Respondent, demonstrates, at a minimum, that the parties did not share an intent that Sol Iris would live in Canada beyond August 2005. Thus, Respondent contends the evidence reveals that "Sol Iris does not have a habitual residence within the meaning of the Convention." (Respt.'s Post-Hr'g Mem. 17)

While Respondent may be correct in asserting that there is "no legal barrier to reaching [the conclusion that Sol Iris has no habitual residence] on appropriate facts" (Respt.'s Post-Hr'g Mem. 17), the Court does not find the facts of this case appropriately support Respondent's

---

[36]Respondent persuasively discredits Petitioner's testimony that her parents would care for Sol Iris even if Petitioner did not stay there upon graduating from law school. (Tr. 416-17) As Respondent notes, this testimony is thoroughly undermined by other testimony that Petitioner's parents did not even want to care for Sol Iris during the summer of 2005, apparently on the belief that Sol Iris should always be in the care of either Respondent or Petitioner (Tr. 122), and that Respondent flew from Korea to Canada to retrieve Sol Iris and care for her back in Korea during Petitioner's first year in law school at SUNY Buffalo. (Tr. 483)

claim.  To begin, the legal authority cited by Respondent is distinguishable.  For example, Respondent cites to two circuit decisions, *Holder*, 392 F.3d at 1020; *Delvoye v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003), *cert. denied*, 540 U.S. 960 (2003), both of which were limited to the question of when a newborn acquires a habitual residence.  Indeed, the court in *Delvoye* acknowledged this "unique" question "differs from the run of decisions under the Convention where the child is assumed to have a habitual residence initially and the controversy is over a change of that residence."  329 F.3d at 334.

Furthermore, while Sol Iris may have had multiple habitual residences over the course of her short life, there is no question that at least one of those residences has been Canada (the other potentially being South Korea).  Even Respondent's version of the story tacitly acknowledges that between August 2004 and May 2005, Sol Iris was a habitual resident of Canada.  She lived with her mother and her maternal grandparents, attended day care, and had some friends there during this period.  Moreover, the 2004-05 period is not the first time that Sol Iris could be considered a habitual resident of Canada, as she spent the first 16 months of her life in that country as well.  Of course, the Court recognizes that Sol Iris also spent considerable time in South Korea with either or both of her parents – from July 2002 until August 2003 and again from November 2003 until August 2004 – but this does not mean that as of August 2005 she had no habitual residence.  Thus, whatever may be said of the theoretical possibility of a child being stuck in habitual purgatory, the facts of this case do not support Respondent's claim.

While Respondent did not press the point, the Court also has considered his suggestion that Sol Iris could be a habitual resident of New York.  Though analytically similar to Respondent's claim that Petitioner consented to Sol Iris living with Respondent in New York

upon his acceptance to Columbia, the law puts the same facts in a different light when considering the question of habitual residence. More specifically, even though, as discussed below, the Court finds that Petitioner did consent to Sol Iris living with her father in New York, this does not by itself instantaneously shift the habitual residence from Canada to New York. Indeed, even if Petitioner's consent could be construed as pre-retention evidence of shared intent that Sol Iris would *become* a New Yorker, the law requires more before this Court can find that she *was* a New Yorker as of August 2005. *Friedrich I*, 983 F.2d at 1401. Moreover, even if there is some evidence that the parties intended to shift the habitual residence of Sol Iris, the law requires both a change in geography and that the child become acclimatized to the new residence for a shift in habitual residence. *See Gitter*, 396 F.3d at 133; *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1253 (11th Cir. 2004) ("Although the settled intention of the parents is a crucial factor, it cannot alone transform the habitual residence. In addition, there must be an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized."). While it is true, as Respondent suggests, that the amount of time for a four-year-old to acclimatize to a new residence is less than that for an older child, the overwhelming weight of authority suggests the minimum time needed is far greater than the handful of days she was in New York before the allegedly unlawful retention. *See, e.g.*, *Slagenweit*, 841 F. Supp. at 269 (noting that the three-and-a-half year-old girl acclimatized for nine months in United States); Beaumont & McEleavy, *supra*, at 112 ("[I]t is suggested that, in the case of children, six months should be treated as a guideline figure when considering the length of time necessary before

residence might be classified as habitual.").[37]  Thus, the Court finds that Petitioner has met her burden of showing that Sol Iris was a habitual resident of Canada just before her visit to New York.

>           2.      Respondent's Alleged Unlawful Retention and Breach of Petitioner's
>                   Custody Rights

The second and third elements of a *prima facie* case under the Hague Convention are that the Petitioner was exercising rights of custody at the time of retention and that the retention was a breach of those custody rights.  Here, there is no dispute that Petitioner was exercising her rights of custody at the time of the alleged retention.  Furthermore, the Court finds that Petitioner has made a *prima facie* case that her custody rights were aggrieved.[38]

---

[37]At least one court has observed that "technically, habitual residence can be established after only one day as long as there is some evidence that the child has become 'settled' into the location in question." *Brooke v. Willis*, 907 F. Supp. 57, 61 (S.D.N.Y. 1995).  However, that comment appears to have been overtaken by subsequent developments in the law, which makes clear that courts should be "slow to infer" a change in habitual residence. *See Gitter*, 396 F.3d at 134.  Following this axiom, "a prior habitual residence should be deemed supplanted only where the objective facts point unequivocally to this conclusion." *Mozes*, 239 F.3d at 1082 (quotation omitted).

[38]As noted by two academic commentators, there is an apparent tension in finding that an act of retention is unlawful and yet the product of consent, as the defense is defined in Article 13 of the Hague Convention. *See* Beaumont & McEleavy, *supra*, at 131 ("[I]f a custodian consents to a removal or retention, can those acts be described as wrongful?").  The Court has found no case in American law that squarely addresses this conundrum.  One approach may be to view the question as one of burden.  That is, that the initial question is only whether a Hague Convention petitioner has established a *prima facie* case of unlawful retention, which can be rebutted by proof offered by Respondent. *See id.* at 133.  If nothing else, by placing the question of consent in the context of Article 13 of the Convention, the courts preserve the ability to grant a petition even if consent is found to have been given. *See id.* at 132 ("[T]here remains strong justification for not letting prior consent legitimise a removal or retention.  If legitimisation were accepted, a return petition where consent was proved would be rejected under the terms of Article 3; if it were not, the petition would be dealt with under Article 13(1)(a).  The latter would then allow the court to exercise its discretion as to whether or not to make a return order.").

C.    Enumerated Defense of Consent

As noted, once a Hague Convention petitioner establishes a *prima facie* case, the child must be returned to the place of habitual residence unless the respondent can establish one of four narrow defenses.  *See Blondin*, 189 F.3d at 246.  The only defense at issue in this case is that of consent, which is discussed in Article 13 of the Convention.[39]  Under this defense, the Respondent carries the burden of persuading the Court, by a preponderance of the evidence, that Petitioner consented to the removal and retention of Sol Iris.  *See* 42 U.S.C. § 11603(e)(2)(B).

While the parties agree that Respondent's burden is one of preponderance, they disagree as to the type of proof that can meet that test.  Citing a Sixth Circuit decision, Petitioner asserts that to prove consent to removal and retention, Respondent must show either a formal statement by Petitioner, such as testimony in a judicial proceeding, or a "consistent attitude of acquiescence over a significant period of time."  (Petr.'s Post-Hr'g Mem. 10) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996) ("*Friedrich II*")  ("Although we must decide the matter without guidance from previous appellate court decisions, we believe that acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent

_____

[39]Throughout the hearing, Respondent explored the possibility of also pressing a separate defense that return of Sol Iris to Canada would present a "grave risk" of "physical or psychological harm."  *See* 42 U.S.C. § 11603(e)(2)(A) (defense must be established by clear and convincing evidence).  Respondent cited the apparently poor condition of Sol Iris upon her return from Cambodia – *e.g.*, the mosquito bites and missing toenail (Respt.'s Ex. H1, H2, H3) – as well as allegations, apparently originating from statements made by Sol Iris to her father, that Petitioner and Mr. Pfeifer had engaged in improper conduct with Sol Iris or in Sol Iris's presence.  (Tr. 791-96)  In the end, however, Respondent did not ask this Court to deny the petition on the grounds of grave risk of harm to Sol Iris and, therefore, the Court has not addressed this defense.

attitude of acquiescence over a significant period of time.")).

The Court finds this argument unpersuasive. The statement from *Friedrich II* only relates to the defense of acquiescence, which is "analytically distinct" from the consent defense being tendered here. *See Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005). "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.* Thus, while the "consent and acquiescence inquiries are similar," consent "need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a)." *Id.*

The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent. *See id.* For example, it is often the case that a parent consents to the removal of a child to a foreign location for a temporary visit, but not to a longer or even indefinite stay in that country. *See, e.g.*, *Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 871-72 (N.D. Ill. 2001) ("Many cases begin with a parent's taking the child away from home for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the child's return."); *Hazbun Escaf*, 200 F. Supp. 2d at 612-13 (finding that mother granted permission for the child to "*visit* his father in the United States for a brief period; she did not . . . consent to his retention in the United States."). Accordingly, to make out a consent defense, Respondent must establish by a preponderance of the evidence that Petitioner had the "subjective intent" to permit Respondent to remove *and* retain the child for an indefinite or permanent time period.

Here, Respondent did not remove Sol Iris from Canada – Petitioner brought her to

Respondent in New York. Furthermore, the Court finds that the evidence clearly establishes that Petitioner had the subjective intent to permit Respondent to retain Sol Iris in New York. Specifically, this intent was formed when Respondent and Petitioner met in Toronto in April 2005 and agreed that Sol Iris would live with Respondent in New York should he be accepted into Columbia Law School. There was no apparent time limit to this consent.

The Court's finding rests not just on a credibility assessment of Respondent's and Petitioner's testimony about the April 2005 meeting, but also on the other evidence that places the April 2005 meeting in its proper context. Specifically, there was other credible evidence that Petitioner herself wanted to live in New York when she was done with law school. For example, Petitioner had spent the preceding summer working and living in New York. Having become enamored with the apparently lucrative lifestyle of a New York lawyer, Petitioner engaged in a scorched earth effort to find employment in New York's many law firms. Indeed, there was evidence that Petitioner had imagined herself living in New York several years before attending the University of Toronto. Thus, the April 2005 agreement between Petitioner and Respondent regarding Sol Iris becoming a New Yorker was not an snap decision, but was part of a deliberate, if not direct, path that Petitioner intended to take to New York.

The overwhelming evidence of Petitioner's desire to practice law in New York exposes Petitioner's shaky testimony to the contrary as incredible. For example, Petitioner's claim at the hearing that she intended to stay in Toronto after law school and raise Sol Iris there is contradicted by, among other things, her own email to Petitioner in February 2005 where she unequivocally pronounced that she had "no intention to raise [Sol Iris] . . . in Canada." (Respt.'s Ex. D) And while Petitioner offered the testimony of Professor Novogodsky in an effort to

establish some post-law school plan to practice law in Toronto, that morsel of proof merely demonstrated that in late June 2005 Professor Novogodsky was aware that Petitioner wanted to apply for a single job at Amnesty International in Canada. (Tr. 156) There was nothing about this brief testimony, however, that demonstrated that this was the only job Petitioner was interested in pursuing, or that she intended to raise Sol Iris in Canada. Indeed, other evidence presented at the hearing suggested that Petitioner was also interested in possibly returning to Cambodia after graduation to complete the project she had begun in the summer of 2005. Given her initial reluctance to bring Sol Iris to Cambodia in 2005, and the serious health problems that Sol Iris suffered during her brief stay in that country, it is more than fair to infer that any future travel to Cambodia by Petitioner would not include Sol Iris.

Aside from the history that pre-dates and explains the April 2005 agreement, the subsequent conduct and statements of Petitioner and Respondent (and others) further demonstrate Petitioner's consent to Respondent's retention of Sol Iris. For example, Respondent did in fact only apply to NYU and Columbia and to no other law schools after he was accepted into Georgetown, thus demonstrating his commitment to live in New York. Moreover, soon after his acceptance to Columbia in late July, Respondent promptly met with a Columbia official who could assist him in obtaining the F-2 visa Sol Iris would need to live in the United States for longer than six months. The official advised Respondent that he needed to secure certain financial commitments, which he did through his father, and to procure other documents, such as Sol Iris's passport, which he tried to obtain from Petitioner when she dropped Sol Iris off in early August.

The credible evidence also demonstrated that while Respondent pursued the F-2 visa for

his daughter, Ms. Chin conducted some due diligence of a neighborhood day care center for Sol Iris and made substantial alterations to her apartment to allow Sol Iris to live with her and Respondent for the foreseeable future.  In addition, Ms. Chin and her daughter bought books and toys for Sol Iris before her arrival in New York on August 2, 2005.  Ms. Chin did all these things because she believed that Sol Iris was coming to live with her and Respondent indefinitely.  (Tr. 518, 569)

Respondent and his family were not alone in believing that Sol Iris would be living in New York.  While in Cambodia, Petitioner maintained email contact with Respondent.  In one email exchange in early June, 2005, Respondent suggested that his brother could pick up Sol Iris, who was then ill, on his way from South Korea to New York.  Petitioner rejected Respondent's suggestion saying that she "will drop [Sol Iris] at NYC anyway," and instructed Respondent to get Sol Iris's "paperwork" ready, referring to the F-2 visa.  (Respt.'s Ex. E)  Approximately one month later, after Petitioner's visit with Mr. Pfeifer and after telling Respondent that she wanted a divorce, Petitioner sent Respondent another email stating:  "I just hope you prepared the F-2 for Sol Iris, for her extended stay in New York City and for her future travel to D.C."[40]  (Tr. 236)

Further evidence of Petitioner's consent is found in the sequence of events following Petitioner's and Sol Iris's arrival in New York on August 2.  First, there is the obvious fact that Petitioner brought Sol Iris to Respondent to stay with him at Ms. Chin's apartment.  Thus, there

---

[40]At the time this email was sent, Respondent had not yet heard from Columbia, but the email reflects Petitioner's intent to leave Sol Iris with Respondent in New York, and the possibility that Sol Iris might go with Respondent to Washington should he attend Georgetown.  At a minimum, this email fatally undercuts Petitioner's claim that she intended to allow Sol Iris only a four-day visit with Respondent between August 2 and August 6.

can be no claim that Respondent somehow kidnaped Sol Iris and subsequently hid her from Petitioner. Petitioner not only knew where Sol Iris would be living, but was shown and informed of the preparations Ms. Chin made to accommodate Sol Iris's extended stay in New York, including the alterations in the apartment and the investigation of the nearby day care center. Nor can there be any claim by Petitioner of hostility between her and Respondent's family. The morning she came to Ms. Chin's apartment, the entire family ate breakfast together and Petitioner distributed gifts she had brought back from Cambodia. These facts effectively eliminate any suggestion by Petitioner that Respondent acted unilaterally or with hostility in retaining Sol Iris, or that he intended to block Petitioner's access to Sol Iris. *See Gonzalez-Caballero v. Mena*, 251 F.3d. 789, 793 (9th Cir. 2001) (noting that father "did not fear [mother's] visit, as he likely would have if he was wrongfully retaining" child).

Second, there is the admission by Petitioner in the taxi ride from the airport to Ms. Chin's apartment. Both Respondent and Petitioner (albeit reluctantly) testified that during the taxi ride, Respondent advised Petitioner that he had been accepted into Columbia and upon learning this, Petitioner stated: "wow, she's [Sol Iris] going to be a New Yorker now." (Tr. 239, 282) If the facts were as Petitioner testified, there would be no reason for her to make that comment. Instead, the comment can only be explained as an acknowledgment of the earlier agreement that Sol Iris would live with Respondent if he attended law school in New York.

After she attended Sol Iris's doctor's visit on August 3 to address the mosquito bites and missing toenail, Petitioner made no contact with Respondent until August 5 (the day before Petitioner was supposedly going to leave with Sol Iris). It was on this date that Petitioner first expressed a change of heart about leaving Sol Iris in New York. This expression of regret came

in the form of an email in which Petitioner informed Respondent that she wanted to extend her stay in New York until August 9 in order "to sit down and talk about [I]ris." (Respt.'s Ex. I) Noting that she was "fully booked today with lunch and dinner meetings," Petitioner indicated she would be free to meet with Respondent the next day. (Respt.'s Ex. I) Petitioner then went on to say that her "heart is breaking to part her [Sol Iris], and that is my personal interest," and that she did not "know whether it is good for her to stay here." (Respt.'s Ex. I) Petitioner then suggested that "it may be better for [Sol Iris] to stay with me till she reaches age of 5 and after" Respondent has "fully settled" in New York. (Respt.'s Ex. I)

While this email may show that Petitioner regretted her decision to allow Sol Iris to live with Respondent while he attended law school in New York, it powerfully demonstrates that Petitioner had, in fact, consented to leave Sol Iris in New York with Petitioner. *See Gonzalez-Caballero*, 251 F.3d at 794 ("[C]onduct after removal can be useful in determining whether consent was present at the time of removal."). Otherwise, there would be nothing to regret. Put another way, Petitioner's expression of regret "makes no sense if [Sol Iris] was to have been [in New York] only briefly . . . ." *Id.* at 793. Indeed, if Respondent had in effect abducted Sol Iris, as Petitioner would have this Court believe, Petitioner would not be weeping about "parting" with her daughter, but instead would be insisting on her immediate return, noting among other things, that she was supposed to be leaving for Canada the next day and that Sol Iris had to go home to attend junior kindergarten. Moreover, Petitioner's suggestion in the email that Sol Iris stay with Petitioner until her fifth birthday (aside from being nonsensical given that her March birthday would mean moving in the middle of the school year) is only further evidence of Petitioner's *post hoc* regret and a vain effort to alter the agreement. At most, then, this email is

an attempt at revocation or modification of the previously-provided consent to have Sol Iris live with Respondent. As such, it does not "revive her right to return under the Convention." *Gonzalez-Caballero*, 251 F.3d at 794.[41]

Any doubt about the significance and meaning of the August 5 email is erased by the meeting between Petitioner and Respondent on August 6 during which Petitioner initially repeated her demand to take Sol Iris back to Toronto but ultimately conceded that Sol Iris would stay in New York. Petitioner then expressed her interest in joint custody over Sol Iris and to move to New York to be near her, indicating that Petitioner had been trying to meet with people during her stay in New York to obtain employment.

Aside from her own version of the events, which the Court has found is not to be believed, Petitioner points to several other facts to rebut the consent defense. None is persuasive. For example, Petitioner cites the fact that she and Respondent had pre-registered Sol Iris for junior kindergarten in Toronto beginning in September 2005 as proof that there was no plan to have Sol Iris live in New York. (Petr.'s Post-Hr'g Mem. 11) However, the Court accepts Respondent's testimony on this point, which was that he agreed to pre-register Sol Iris for junior kindergarten in April 2005 as a backup plan in the event that he was not accepted into law school at either Columbia or NYU.

Petitioner also points to the consent-to-travel form that Respondent signed in April 2005. (Petr.'s Ex. 3) According to Petitioner, this form demonstrates that Respondent consented to

---

[41]The Court recognizes that, with the help of Mr. Pfeifer, Petitioner sent a second email on August 7, this time threatening legal action (Petr.'s Ex. 2), and that she later followed through with legal action. However, nothing about this conduct alters the consent Petitioner gave to Respondent as of August 2. *See Gonzalez-Caballero*, 251 F.3d at 794-95.

allowing Sol Iris to return to Canada with Petitioner upon completion of the Cambodian internship. (Petr.'s Post-Hr'g Mem. 10) However, this form merely reflected Respondent's consent to allow Petitioner to take Sol Iris with her to Cambodia. Nothing about this form reflects any consent on Respondent's part that Sol Iris would live with Petitioner during the academic year 2005-2006. Moreover, even if this form could be interpreted as Petitioner wishes, it merely would reflect Respondent's consent before he was accepted into Columbia.

Petitioner also points to the facts that Respondent had not secured Sol Iris's passport or her F-2 visa as supporting her claim that she did not consent. Yet, Respondent testified that he could not obtain, let alone apply for the F-2 visa, until after he was accepted at Columbia and after he obtained Sol Iris's passport, the latter of which he was dependent upon Petitioner to provide and which she offered to give. (Tr. 312-13, 532) Therefore, Respondent can hardly be blamed for the fact that he did not have Sol Iris's F-2 visa upon her arrival on August 2.

Finally, Petitioner notes that Sol Iris had very few belongings (and none of her winter clothes) when she and Petitioner arrived in New York on August 2, thus purportedly undercutting any claim that there was an agreement that she would live indefinitely with Respondent. This is a specious claim since it would have made no sense for Petitioner to lug all of Sol Iris's belongings (including her winter clothes) to Cambodia in the summer, particularly before it was known where Respondent would be attending law school. (Tr. 431-32) Moreover, this claim ignores Ms. Chin's testimony that she and her daughter purchased a number of items for Sol Iris before her arrival (Tr. 569), Respondent's testimony that he purchased other clothing for Sol Iris after her arrival (Tr. 532), as well as the testimony that Respondent offered to make arrangements with Petitioner's family to have Sol Iris's belongings sent to New York. (Tr. 431-

Thus, based largely on the Court's assessment of the credibility of the witnesses, the Court finds that Respondent has met his burden of showing by a preponderance of the evidence that Petitioner consented to the child's removal and retention as of August 2, 2005. However, the Court recognizes that this finding does not require that the petition be denied. Rather, it only grants the Court the discretion to deny the petition. *See Hague International Child Abduction Convention: Text and Legal Analysis*, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986); *Friedrich II*, 78 F.3d at 1067. Though the Court inquired as to the standard the Court should apply in exercising its discretion (Tr. 17, Sept. 21, 2005), the parties failed to provide any authority.[42] Nonetheless, it seems clear that the Court, in applying the narrow Article 13 defenses when a petitioner established a *prima facie* case for return of the child, is to grant a petition if return of the child to the place of habitual residence would further the aims of the Convention. *See Friedrich II*, 78 F.3d at 1067; *Pesin v. Osorio-Rodriguez*, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999); *Wanninger v. Wanninger*, 850 F. Supp. 78, 81 (D. Mass. 1994). As previously noted, the Hague Convention is "primarily concerned with the 'use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child.'" *Gitter*, 396 F.3d at 129 (quoting *Perez-Vera Report, supra*, ¶ 11). Thus, the principal goal of the

---

[42]In her post-hearing Memorandum of Law, Petitioner discussed the exercise of the Court's discretion in the context of the Article 13 defense dealing with a grave risk of harm to the child. In that context, Petitioner indicated that the Court could consider the best interests of the child, prompting the Court to comment during its oral ruling that even that test would not cause the Court, in the exercise of its discretion, to order the return of the child. (Tr. 62) However, so there is no confusion, the Court does not base its decision to decline to order the return of the child on any finding regarding the best interests of the child. The Court fully understands that this calculus is not for this Court to make, even in the exercise of its discretion under Article 13 as it relates to the consent defense. *See Blondin*, 189 F.3d at 246.

Hague Convention is to deprive would-be abductors of the perceived advantages of "removing children to jurisdictions more favorable to their custody claims . . . ." *Id.*

Given this objective, the Court has little difficulty in finding that return of Sol Iris to Petitioner would not be appropriate to further the goals of the Hague Convention. Respondent did not cross international borders, kidnap his daughter, and bring her back to New York in order to gain a jurisdictional home court advantage. Indeed, it was Petitioner who brought Sol Iris to Respondent, who himself was just beginning to settle in his new home city to attend law school. Thus, there is nothing from the record that would suggest Respondent behaved as he did because he believed New York would be a more hospitable forum to have a custody battle. Therefore, the Court does not believe that return is necessary, or even appropriate, to further the objectives of the Hague Convention. To the contrary, while the Convention seeks to preserve the *status quo* in order to discourage parents from ripping children from their settled lives, the *status quo* here, at the time of Respondent's retention, was that Sol Iris was to live with her father in New York. Thus, the Court declines to exercise its discretion and order the return of Sol Iris to Canada.

## III. Conclusion

For the reasons stated on the record of September 21, 2005 and herein, the Court hereby

dismisses the Petition.

SO ORDERED.

Dated:      December **8**, 2005
            New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE